UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARREN LAPINE,

                Plaintiff,

v.

WAYNE COUNTY, ECOLAB, INC., CMB
MANAGED SERVICES, OFFICER WEDLOW,
OFFICER COHEN, OFFICER DAVIS, OFFICER
NICHOLSON, and OFFICER HALL,

                Defendants.

_____/

Case Number 21-11308
Honorable David M. Lawson

**ORDER ON SUMMARY**
**JUDGMENT MOTIONS AND**
**SETTING TRIAL DEADLINES**

JAMES LOMAX,

                Plaintiff,

v.

WAYNE COUNTY, ECOLAB, INC., CBM
MANAGED SERVICES, OFFICER WEDLOW,
OFFICER COHEN, OFFICER DAVIS, OFFICER
NICHOLSON, and OFFICER HALL,

                Defendants.

_____/

Case Number 21-11533
Honorable David M. Lawson

CALVIN ANTHONY MILES,

                Plaintiff,

v.

WAYNE COUNTY, ECOLAB, INC., CBM
MANAGED SERVICES, OFFICER WEDLOW,
OFFICER COHEN, OFFICER DAVIS, OFFICER
NICHOLSON, and OFFICER HALL,

                Defendants.

_____/

Case Number 21-13003
Honorable David M. Lawson

**OPINION AND ORDER DENYING DEFENDANT ECOLAB'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANT WAYNE COUNTY'S MOTION FOR SUMMARY JUDGMENT, AND AMENDING CASE MANAGEMENT ORDER**

These consolidated cases arise out of incidents in which the plaintiffs, while confined in the Wayne County Jail infirmary, allegedly were scalded by hot water that improperly was routed to the cold-water supply lines of the toilets in their cells. The three plaintiffs each sued Wayne County and its correctional officers, a food service company, and the alleged installer of a device that rerouted the hot water. The cases were consolidated for discovery. The alleged installer, defendant Ecolab, Inc., moves for summary judgment on several theories. Wayne County moves for summary judgment in the James Lomax case, arguing that Lomax has not offered any evidence that his injury was caused by a custom or practice of the County itself. The Court heard oral argument on the motions on June 15, 2023. The record demonstrates that factual issues preclude summary judgment for defendant Ecolab, but Lomax has not established municipal liability against the County. Ecolab's motion for summary judgment will be denied; Wayne County's motion for summary judgment will be granted as to plaintiff Lomax's claims.

I.

The plumbing hazard that led to the three plaintiffs' injuries resulted from the improper connection of a faucet adapter (referred to by the parties as a "Kay Kit"), which was designed to divert water from the faucet in a kitchen located in the basement of the Wayne County jail into nearby soap dispensers, where the water would mix with soap and then return to the kitchen sink basin. The problem occurred whenever the faucet handles were left on and the soap dispenser flow control was turned off, which allowed higher pressure water from the hot-water supply line to backflow into the lower pressure cold-water supply line, resulting in the diversion of hot water through the cold-water supply lines into the toilet water supply lines for two cells located two floors above the jail kitchen.

A. Plaintiffs

1. Darren LaPine

On September 13, 2019, plaintiff Darrin LaPine was an inmate of the Wayne County Jail and was housed in Cell 7-A of the jail infirmary. The cell had its own toilet, which is made of stainless steel. LaPine is confined to a wheelchair and has to transfer from the wheelchair to the toilet when he needs to use it. He also requires the assistance of a cane to do so. Sometimes it would take him seven minutes or more to get himself from the wheelchair to the toilet or back again. On September 13, 2019, after he used the toilet, LaPine flushed while sitting on the seat, and he then "felt a burning sensation." He put his hand down into the toilet and felt "scorching hot" water. He then rolled off the toilet onto the floor. It took around 20 seconds to maneuver off the toilet. He said that after he was on the floor, he saw steam rising from the toilet basin. LaPine then wiped himself with some toilet paper, put his shorts back on, and got back into his wheelchair.

LaPine said that before he pushed the flush switch the toilet was cold, but as soon as he pushed it the toilet felt hot. After he was back in his wheelchair, LaPine wheeled to the door and beat on it and yelled. Nobody responded immediately. Around 30 minutes later, defendant Corporal Wedlow came to the cell, and LaPine then told him that he had been burned while using the toilet, and he needed medical attention. Wedlow told LaPine that "there's nobody available in medical," and that "these toilets [have] been this way for six months and they all know about it." Darrin LaPine dep., ECF No. 76-23, PageID.2088. LaPine asked to speak to Wedlow's supervisor and was told that the supervisor "already made his round." *Ibid.* He asked to speak to a social worker, and Wedlow said, "I'll make a call to her." *Ibid.* LaPine also asked for grievance forms, and Wedlow said "we don't have any." *Id.* at 2089. After LaPine spoke with him, Wedlow left and did not return, and LaPine was told by a deputy on the next shift that Wedlow had not passed on any information about LaPine's complaint. LaPine said that he had some extra forms in his

cell, and sometime later he prepared a handwritten grievance about the incident.  LaPine gave his grievance form to Deputy Nicholson sometime on September 14, 2019.

LaPine said that he remained in Cell 7-A through October 2019, and in the week after the burn incident he was able to use the toilet in his cell without problems, but each time the toilet was filled with steaming hot water, and LaPine avoided further injuries by waiting until he was off the toilet to flush it.  Sometime around 10:00 p.m. on September 13, LaPine was visited by Nurse Pruitt.  LaPine related the scalding incident to her, and she gave him some ointment, gauze, and bandage tape.  LaPine said that he was scalded by the hot water on his testicles and his legs.  LaPine said that he continued to file grievances on a daily basis after September 13, 2019 reporting the hot toilet.  LaPine testified that almost two months later, in November 2019 he saw stacks of grievance forms that he had submitted "in the basket at the officers' station," apparently never having been processed, reviewed, or transmitted to anyone.  *Id.* at 2126-27, 2131, 2138-39.  LaPine said that he also submitted further grievances using a new electronic process, including about the fact that there had been no response to any of his prior grievances.

## 2. James Lomax

The factual details of plaintiff James Lomax's alleged injury incident are undisputed for the purposes of the present motions, and no party has submitted any deposition testimony by Mr. Lomax.  The following facts are taken from Lomax's complaint.  On September 22, 2019, Mr. Lomax was an inmate at the Wayne County Jail, housed in the jail infirmary.  When he used the toilet in his cell, "the scalding hot water [and metal toilet] [caused] severe burns to his buttocks, testicles, scrotum, and thighs."  Compl. ¶ 15.  "The scalding hot water and toilet caused [the] [p]laintiff's skin to peel off into [his] hands and [he] began yelling for help along with other detainees."  *Id.* ¶ 16.  The plaintiff says he was denied prompt medical treatment for his severe burns, but eventually he was transported to Detroit Receiving Hospital, where he underwent

multiple surgeries and other treatment for the burns.  The plaintiff alleges that he has "permanent scarring on his buttock and thighs in the shape of a toilet, and has suffered extreme pain and suffering, humiliation, and emotional distress."  *Id.* ¶ 20.

### 3. Calvin Miles

In September 2019, plaintiff Calvin Miles was an inmate of the Wayne County Jail and was housed in the jail infirmary.  At the time, Miles had to use a wheelchair because he had a broken ankle and could not walk.  When he used the toilet in his cell, Miles flushed it several times, and hot water splashed onto his back, causing burns on his lower back.  The burns were serious enough that they caused bleeding and removed skin from his back.  He also suffered permanent scarring from the burns.  After he was burned, Miles fell off the toilet.  He yelled for help, but nobody came to his aid.  Miles eventually was able to get back into the wheelchair on his own, wheeled himself to the door, and called out for help.  Defendant Deputy Nicholson came to the door and Miles said he needed medical treatment, but Nicholson smiled and said nothing.  On the following day, Miles told another officer that he needed to see a nurse for his injuries, but he was not seen by medical staff.  Later, Miles spoke to several jail nurses and deputies and requested medical treatment for his burns, but his requests were denied.  He also wrote a medical kite requesting treatment and delivered it to a nurse.

### B. Plumbing Problem

Joseph Alfieri is employed by former defendant Summit Foods, LLC, which provides food service under contract with the Wayne County Jail.  He testified that Ecolab took over the responsibility for providing soap dispensers in the jail kitchen in 2017, and when they took over "[t]here was a team from Ecolab that came out to install everything."  Joseph Alfieri dep., ECF No. 76-5, PageID.1738.  Alfieri said that when Ecolab took over, Shawn Florence was the representative who serviced the jail.

Shawn Florence is a route sales manager for defendant Ecolab, Inc. and has worked for Ecolab since 2011.  His job duties include "going around" to customer locations, "do[ing] repairs," and "sell[ing] new accounts."  Shawn Florence dep., ECF No. 76-2, PageID.1576.  Florence does not hold any professional certifications or licenses.  He is not a licensed plumber in the State of Michigan.  In 2019, his job included servicing soap dispensers at the Wayne County Jail.  He would visit the jail once a month to make sure that the dispensers were working.  Florence identified the soap dispensers that were installed in the jail kitchen on September 2019, and he said that he installed them on September 13, 2019.  *Id.* at 1584, 1587, 1606.  The reason for the installation was that the existing dispensers had been "broken off the wall."  *Id.* at 1609.

Florence said that Ecolab's dispenser installations typically use a faucet adapter known as a "Kay Kit," which was supplied by Ecolab, connected between the top of a sink faucet and the bottom of the spout, and which also included a shutoff valve.  Florence said that the use of the faucet adapter was a "standard hookup" used by "lots of chemical companies" and that he has installed hundreds of such devices.  Florence dep. at PageID.1593.  The connection of the dispensers to the sink faucet on September 13, 2019 was made with a "Kay Kit" faucet adapter.  *Id.* at 1615.  However, Florence stated that the "Kay Kit" already was in place when the broken dispensers were replaced.  Florence admitted that the "Kay Kit" in use at the kitchen sink was identical in form and function to those supplied by Ecolab.  *Id.* at 1661; *see* Faucet Plus Sink Adapter Product Description, ECF No. 76-10, PageID.1903-05.

Florence said that at times before September 2019, he had instructed the Wayne County Jail food service manager, Keith Lawrence, and Joe Alfieri, a representative of defendant Summit Foods, LLC, along with unnamed inmates who were working in the kitchen, that the sink faucets should be turned off after using the soap dispensers, to avoid a situation where excess pressure

might "blow out" the hose leading to a dispenser and flood the kitchen.  *Id.* at 1596, 98.  Florence admitted that he could not identify any of the inmates that he might have instructed about using the dispensers.  He said that his demonstration for operating the soap dispensers was limited to whoever was present when he happened to visit the facility.  The only written documentation or instructions supplied for the dispensers were a "wall chart" and a "ware washing poster" that explained "how to wash dishes."  *Id.* at 1601-03.

Steven Woodbeck is an employee of defendant Wayne County and a licensed plumber in the State of Michigan.  He attended trade school in the late 1980s and completed a five-year apprenticeship before becoming a licensed journeyman plumber.  He also holds a certification relating to backflow and cross-connection issues in plumbing systems.

Woodbeck testified that he responded to an emergency call on Sunday, September 22, 2019, reporting that an inmate in the Wayne County jail infirmary had been burned by "extremely hot water" in a toilet.  Woodbeck dep. at PageID.1474, 1526.  When he arrived at the jail and went to the infirmary, he used a laser thermometer, which indicated that water in the toilet bowl where the prisoner was burned was 150 degrees.  That was startling to him, and he consulted the facility blueprints to determine where the hot water might be coming from.  He said that the only place in the building where water that hot was produced was the jail kitchen, which is directly below the infirmary and served by the same cold water supply line as the infirmary two floors above.  Woodbeck went down to the kitchen and investigated the hot water heater to see if it was overheating, but he found that it was operating properly.  Looking further, he then noticed "the cross-connection thing" attached to the kitchen sink faucet.  *Id.* at 1475.  When he tried to turn the faucets off "it actually burned [his] fingers," because "the handles on the sink had actually obtained [sic] the same temperature as the water because there was a constant flow happening."  *Ibid.*

Woodbeck "knew instantly that [he] had found the culprit," and he "immediately removed that device that had been added to the faucet to stop that condition from happening again." *Ibid.* On the following Monday, Woodbeck directed another plumber to cut into the hot water supply line below the sink to add a proper supply tap for the soap dispensers that had been fed by the faucet adapter.

Woodbeck testified that because the jail is a high-rise building there are separate pumps for hot water and cold-water supply pressure. He said that although the pressures produced by the two systems are close, the hot water pump produces "slightly more PSI than the cold." Woodbeck dep. at PageID.1490. He said that when both sink faucet handles were left open as he found them, and the water flow stagnated because the flow through the faucet adapter device was turned off, higher pressure hot water was diverted into the lower pressure cold water supply line, which then routed hot water upstairs to the infirmary. Woodbeck explained that with an installation in a low-rise building or a "typical kitchen," the pressure differential would not be a factor, and often there would be no problem using a faucet adapter to feed soap dispensers. However, he said that the state plumbing code requires that all water supply installations or modifications be done by a licensed plumber to ensure that safety considerations such as the high-pressure hot-water supply would be kept in mind, and that the installer would consider all relevant aspects of the water supply system to determine the correct method of connection. He further testified that the state plumbing code specifically requires that "to alter the piping or fixtures in an institutional building" a plumbing license is required. *Id.* at 1506. Woodbeck said that any licensed plumber would have known right away that hooking up the faucet adapter to the type of water supply system that the Division 1 Jail building used was unacceptably unsafe. *Id.* at 1555-57.

- 8 -

Woodbeck testified that he did not know when the soap dispensers in the jail kitchen were installed.  However, nobody from the County's maintenance department was involved in the installation, and Woodbeck was not aware of the faucet adapter installation until he got the call about hot water in the infirmary toilets.  Woodbeck said that there never was any inquiry to his department by anyone about having soap dispensers hooked up to the water supply.  Woodbeck testified that he was the only maintenance department employee with authority to purchase materials, so he would have known if any request was put in to make a water supply connection, since he would have had to buy or authorize the purchase of materials to fill the request.  Woodbeck also testified that if a vendor needed a plumbing hook up performed, then they should have submitted a work order, but his department never received any work order for a hook up of soap dispensers in the kitchen.  Woodbeck said that he did not believe that the faucet adapter could have been installed for a long time because if the adapter had been in place for many years problems would have occurred long before the incident in question.

Woodbeck said that within a month after he removed the problematic faucet adapter at the Jail Division 1 building, he went to the separate facility at Division 3 — apparently also serviced by Ecolab — and found that the identical type of adapter had been installed in the same way in the kitchen there.  Woodbeck dep. at 1495-96, 1530.  Woodbeck immediately removed the faucet adapter, and the vendor subsequently contacted him and requested a water line hook up, which was performed in the same way as the corrected hookup at Division 1.

Charles Lennox is the maintenance manager for the Wayne County Jail.  He has held that position since 2015.  Lennox said that he was in the jail kitchen on September 23, 2019, which was the Monday after the incident to which Woodbeck responded.  He saw a faucet adapter sitting on a plumber's cart in the kitchen, which he identified from a photograph as the same type of "Kay

Kit" adapter used by Ecolab.  Lennox said, however, that he was unaware of the adapter being attached to the jail sink and had "never noticed" any such adapter in use on the sinks.  Charles Lennox dep., ECF No. 76-4, PageID. 1716-17.  Lennox said he received a call from Keith Lawrence who stated that "someone from Ecolab was there," and that the Ecolab representative had asked for "their equipment" to be returned to them after it was removed from the sink.  *Id.* at 1720, 1723.  Lennox retrieved the faucet adapter from the plumber's cart and took it down to "a person that was [in the kitchen who was] asking for it saying that it was their equipment and they wanted it back."  *Ibid.*  Lennox then left the kitchen, and he did not know what happened to the adapter after it was surrendered.  *Id.* at 1724.

### C.  Proceedings

The plaintiffs filed their complaints in June, July, and December 2021.  Two of the cases were reassigned to this Court and all three then were consolidated for discovery.  In Counts I, II, and III, the complaints plead claims against defendants Wayne County and various jail officers and medical staff for violations of the Eighth Amendment and for municipal liability.  In Count IV, the plaintiffs attempt to advance a theory of liability against former defendant Summit Food Service, LLC and defendant Ecolab, Inc., alleging that they are third-party beneficiaries under the contracts with Wayne County.  And in Count V, the complaints frame claims of negligence against former defendant Summit Food Service, LLC and defendant Ecolab, Inc.  The plaintiffs eventually reached settlements with defendant Summit and the several jail nurses and doctors who were named in the complaint.  The surviving claims are against several jail officers, the County, and defendant Ecolab only.  Defendants Ecolab, Inc. and Wayne County filed motions for summary judgment, which are now before the Court.

## II. Ecolab's Motion

Defendant Ecolab argues that the third-party beneficiary claims for breach of contract cannot be sustained because the plaintiffs have uncovered no evidence of any contract to which defendant Ecolab was a party, a point that the plaintiffs do not dispute. Those claims will be dismissed. It also contends that the negligence claims cannot proceed because there is "no evidence" that Ecolab had any involvement with the installation of the problematic adapter kit on the kitchen faucet, which caused the hot water backup into the cold water supply line; it is "undisputed" that defendants Summit Food Service and Wayne County were "responsible" for the soap dispensers and plumbing connections; Ecolab did not owe any duty to the plaintiffs because it had no relationship with them; and the harm that the plaintiffs suffered was not foreseeable. As to plaintiffs LaPine and Miles (but not plaintiff Lomax), the defendant also contends that there is "no evidence" that they were injured, because there was "no documentation" produced by defendant Wayne County to substantiate any complaints of injuries or delivery of associated medical treatment.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute. *Id.* at 558. (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

Michigan law governs this count of the complaints. Under Michigan law a negligence claim "requires proof of 'four elements: duty, breach of that duty, causation, and damages.'" *Miller v. Gettel*, No. 22-1034, 2023 WL 2945340, at *10 (6th Cir. Apr. 14, 2023) (quoting *Fultz v. Union-Com. Assocs.*, 470 Mich. 460, 463, 683 N.W.2d 587, 590 (2004)). "'Actionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other, and such duty must be imposed by law.'" *HDI Glob. SE v. Magnesium Prod. of Am., Inc.*, No. 360385, 2023 WL 2938557, at *2 (Mich. Ct. App. Apr. 13, 2023) (quoting *Clark v. Dalman*, 379 Mich. 251, 260-61, 150 N.W.2d 755, 759-60 (1967)).

## A. Duty

The defendant argues that it had no duty of care toward the plaintiffs because there was "no relationship" between Ecolab and the plaintiffs, and because there is "no evidence" that any contract existed to which Ecolab was a party. That position, however, simply overlooks the most basic premise of common law negligence liability, which is that when a party undertakes to do a task, it assumes a duty to do so with reasonable care so as to avoid injury to others. Whether a contract existed or not and the scope of any contractual obligations is irrelevant to the question whether the defendant breached the universal common law duty of ordinary care.

"As *Loweke v. Ann Arbor Ceiling & Partition Co.*, 489 Mich. 157, 809 N.W.2d 553 (2011), explained, 'a contracting party's assumption of contractual obligations does not extinguish or limit separate, preexisting common-law or statutory tort duties owed to noncontracting third parties in the performance of a contract.'"  *Miller v. Gettel*, No. 22-1034, 2023 WL 2945340, at *11 (6th Cir. Apr. 14, 2023) (quoting *Loweke*, 489 Mich. at 172, 809 N.W.2d at 562).  "Michigan's common-law duty, [] 'imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to unreasonably endanger the person or property of others.'"  *Ibid.* (quoting *Clark v. Dalman*, 379 Mich. 251, 261, 150 N.W.2d 755, 760 (1967)).  "As reiterated in *Fultz v. Union-Com. Assocs.*, 470 Mich. 460, 683 N.W.2d 587 (2004), '[i]f one voluntarily undertakes to perform an act, having no prior obligation to do so, a duty may arise to perform the act in a nonnegligent manner.'"  *Ibid.* (quoting *Fultz*, 470 Mich. at 465, 683 N.W.2d at 591).  "Thus, Michigan adheres to the common-law principle that 'if one having assumed to act, does so negligently, then liability exists as to a third party for failure of the defendant to exercise care and skill in the performance itself.'"  *Ibid.* (quoting *Loweke*, 489 Mich. at 171, 809 N.W.2d at 561).

Contrary to the defendant's arguments, there is ample circumstantial evidence in the record from which a jury reasonably could infer that defendant Ecolab undertook voluntarily to install the problematic "Kay Kit" faucet adapter.  When it did so, it assumed the fundamental common law duty to exercise ordinary care in that undertaking.  First, Summit Food Service representative Joseph Alfieri testified that in 2017 Ecolab took over the job of supplying soap for the jail kitchen, and when it did so a team from Ecolab came in "to install everything."  Second, Ecolab's route sales manager assigned to the jail, Shawn Florence, identified the "Kay Kit" that was exhibited in various photographs and product literature exhibits as identical to those that Ecolab supplies for

use with its soap dispensers.  Florence said that such an adapter is a "standard hook up," and he admitted that he had installed "hundreds" of them during his tenure with Ecolab.  Florence also admitted that on September 13, 2019, he went to the jail and installed replacement dispensers, and he said at that time the faucet adapter was in place on the sink.  The Jail's licensed plumber, Steven Woodbeck, testified that Ecolab never initiated any work order or made any contact with his department seeking to have a proper hookup completed, and he never had seen the faucet adapter installed before he got the call about the hot water toilet problem.  The Jail's maintenance manager Charles Lennox said that he similarly was unaware of the faucet adapter and never had noticed it before the hot toilet incident involving plaintiff Lomax.

Finally, and most compelling, Lennox further testified that on the day after Woodbeck removed the adapter, Ecolab's representative came to the jail and insisted that "their equipment" be returned, and he said that he personally surrendered the device to the Ecolab representative. Ecolab argues that this evidence would not be admissible at trial, because Lennox came upon this information only through a conversation with fellow county employee Keith Lawrence, so Lennox would have no personal knowledge, or his rendition of Lawrence's statement would violate the hearsay rule.  But Lennox testified at his deposition that he himself retrieved the faucet adapter from the plumber's cart and took it down to "a person that was [in the kitchen who was] asking for it saying that it was their equipment and they wanted it back."  Charles Lennox dep., ECF No. 76-4, PageID.1723.  That testimony satisfies the personal knowledge requirement, *see* Fed. R. Evid. 602, and does not implicate the rule against hearsay, *see* Fed. R. Evid. 801, 802.

Florence says that he has no recollection of the incident and that there is no record of that visit.  But that void in the record does not defeat the affirmative evidence suggesting that Ecolab installed "everything" associated with the dispensers, that the faucet adapter used was the type

supplied by Ecolab and previously installed by it at hundreds of sites, and that when the adapter was removed Ecolab asserted ownership of it and demanded its return. That evidence is sufficient to support a finding that, apart from any other activities, Ecolab voluntarily undertook to install the faucet adapter on the kitchen sink at its own initiative. In so doing, it assumed a common law duty to complete that undertaking with reasonable care, in a manner sufficient to protect other uses of the jail water system from foreseeable harm.

As the Michigan Supreme Court has explained, the fact that a contract existed (or not) does not vitiate the ordinary duty of care assumed during such an undertaking. *Loweke*, 489 Mich. at 172, 809 N.W.2d at 562 ("Under *Fultz*, a contracting party's assumption of contractual obligations does not extinguish or limit separate, preexisting common-law or statutory tort duties owed to noncontracting third parties in the performance of a contract."). Instead, the "proper initial inquiry" is "whether, aside from the contract, the defendant owed any independent legal duty to the plaintiff." *Ibid.* The absence of evidence of any contract in this case does not undermine the plaintiffs' negligence claims. The duty imposed by the common law of torts "is separate and distinct from defendant's contractual obligations." *Ibid,*

Nor is such a duty avoidable merely because the defendant had no individualized relationship with other persons who might be exposed to a hazard created by the defendant while on the premises or using facilities subjected to the defendant's tampering. "Such duty of care may be a specific duty owing to the plaintiff by the defendant, or it may be a general one owed by the defendant to the public, of which the plaintiff is a part." *Fultz*, 470 Mich. at 465, 683 N.W.2d at 591. In this instance, the inmates of the jail were members of the usual population of the premises of the jail for extended periods. The defendant had a duty to use due care in its activities so as to avoid harm to other occupants of the premises, whoever those might be. *See Clark*, 379 Mich. at

262-63, 150 N.W.2d at 760-61 ("The general duty of a contractor to act so as not to unreasonably endanger the well-being of employees of either subcontractors of inspectors, or anyone else lawfully on the site of the project, is well settled. It is clear defendant owed such a duty to plaintiff, who was lawfully on the premises at defendant's request.").  The scope (or any limitations) of the defendant's duties under whatever contract for its services may have existed is irrelevant to application of the common law duty of care.  *Loweke*, 489 Mich. at 172, 809 N.W.2d at 561 ("[D]efendant's motion was brought exclusively under the erroneous belief that defendant owed no duty to plaintiff because defendant's performance and the hazards associated with that performance were the subject of defendant's contract with the general contractor."); *see also Miller*, 2023 WL 2945340, at *11 ("Miller [] alleges that Intoximeters deficiently performed the inspection of the subject DataMaster DMT and engaged in 'deceptive' falsification of 'certification records.' That implicates an independent common-law duty to perform and record certification inspections in a non-negligent manner.").

The law is plain: "Michigan law incorporates the voluntary-assumption-of-duty doctrine, a simple idea that is embedded deep within the American common law of torts: if one having assumed to act, does so negligently, then liability exists as to a third party for failure of the defendant to exercise care and skill in the performance itself." *Leone v. BMI Refractory Servs., Inc.*, 893 F.3d 359, 363 (6th Cir. 2018) (cleaned up).  Regardless of any other obligation the defendant assumed (or not) as a subcontractor or vendor, it is not relieved of the basic duty to exercise due care in all voluntary undertakings, including in this instance the voluntary undertaking of installing the problematic faucet adapter.  *See ibid.* ("When BMI performed on its contract — especially when it inspected the alloy chute for any loose slag — it assumed to act. It thereby took on a duty to perform the act in a nonnegligent manner. Viewing the facts in the light most favorable

to the plaintiffs, Michigan law would recognize that BMI owed Leone a duty separate and distinct

from its contractual obligations to A.K. Steel.") (cleaned up); *HDI Glob. SE v. Magnesium Prod.*

*of Am., Inc.*, No. 360385, 2023 WL 2938557, at *2 (Mich. Ct. App. Apr. 13, 2023) ("[D]efendant

owed Daimler, as a member of the public, a general common law duty to use due care during its

undertakings, and this duty was separate and distinct from its contractual obligations to MBUSI.")

(citing *Clark*, 379 Mich. at 261, 150 N.W.2d at 760).

## B. Breach

There is sufficient evidence to support a finding that, when it illegally installed the

problematic faucet adapter, Ecolab violated the ordinary duty of care in that undertaking.  First,

under Michigan law, violation of a safety regulation gives rise to a rebuttable presumption of

negligence where (1) the statute is intended to protect against the result of the violation; (2) the

plaintiff is within the class intended to be protected by the statute; and (3) the violation was a

proximate contributing cause of the occurrence.  *Klanseck v. Anderson Sales & Serv., Inc.*, 426

Mich. 78, 87, 393 N.W.2d 356, 360 (1986).   There is sufficient evidence to support that

presumption here.  But even in the absence of a rebuttable presumption, regulatory violations may

serve as evidence of negligence.  *In re Consumers Energy Co. for Gas Cost Recovery*, No. 356330,

--- N.W.2d ---, 2022 WL 17998100, at *12 (Mich. Ct. App. Dec. 29, 2022) ("[V[iolations of

administrative rules or regulations do not constitute negligence *per se* but may provide evidence

of negligence.") (citing *Zeni v. Anderson*, 397 Mich. 117, 142, 243 N.W.2d 270, 282 (1976)).

Woodbeck testified that installation of water supply fixtures by a person who is not a licensed

plumber violated the State of Michigan's Plumbing Code.  Florence admitted that he was the one

who installed the dispensers, and there is evidence, discussed above, from which an inference

reasonably may be drawn that he also installed the faucet adapter.  It is undisputed that Florence

is not a licensed plumber.  As Woodbeck attested, the plain purpose of the Plumbing Code

provisions is to ensure that a person adequately trained in the safety complications of water systems such as those used in the high-rise jail structure would be considered when undertaking any alterations of the water supply. The purpose of such regulatory proscriptions plainly is to protect the safety and health all occupants of such buildings who may use the water supply fixtures, including toilets.

Michigan state law makes it illegal for any person to perform "plumbing" work unless duly licensed, subject to limited exceptions that do not apply in this case. "Except as provided in subsections (2) and (3), only a licensed master or journey plumber shall perform plumbing." Mich. Comp. Laws § 339.6107(1). "A licensed master plumber shall be in charge and responsible for proper installation and conformance with the state construction code," and "[p]lumbing shall not be performed unless the plumbing contractor who is responsible has obtained a permit from the state or a governmental subdivision authorized to issue permits." *Ibid.* "'Plumbing' means the practice, materials, and fixtures, in or adjacent to a building, structure, or premises, used in the installation, maintenance, extension, or alteration of all piping, fixtures, plumbing appliances, or plumbing appurtenances, as defined in the state construction code, in connection with the sanitary drainage or storm drainage facilities, plumbing venting systems, medical gas systems, backflow preventers, and public or private water supply systems." Mich. Comp. Laws § 339.6103(c). The permissible exceptional situations under which a person may perform plumbing work without a license include "minor repair work," installation of water service lines when performed under an appropriate permit, installation of certain domestic water filtering systems, and installation by a homeowner of plumbing in his or her own home. *See* MCL 339.6107(2). On the facts presented by the record, none of those exceptions applies here.

Moreover, even absent the plain regulatory violation — which the defendant has made no effort to confront or rebut — other courts applying traditional principles of negligence liability readily have found evidence of breach where a contractor acts carelessly so as to create a new hazard to occupants of a premises. *E.g.*, *Miller v. Gettel*, No. 22-1034, 2023 WL 2945340, at *11 (6th Cir. Apr. 14, 2023) ("*Fultz* [] distinguished another slip-and-fall case, finding that the contractor there breached a duty separate and distinct from the contract by negligently moving snow so as to create a new hazard." (citing *Fultz v. Union-Com. Assocs.*, 470 Mich. 460, 469, 683 N.W.2d 587, 593 (2004)). Similarly, Michigan courts have held on analogous facts that where a defendant causes a discharge of dangerously hot water into places where other persons may come in contact with it, a breach may be found. *Curtis v. Grand Trunk Ry. Co. of Canada*, 178 Mich. 382, 386-87, 144 N.W. 824, 826 (1914) ("It cannot be said, as matter of law, that it owed no duty to the public to refrain from casting the hot water upon the street, by means of the sewer or otherwise, when the volume of the water discharged, the constancy of the flow, and that it formed a pool of hot water in the street, are considered. Such a duty might arise from the fact that it was reasonably to be apprehended that someone lawfully in the street would thereby be injured.").

Likewise, where a contractor fails to exercise due care in the alteration of premises water supply equipment, the resulting hazard to all occupants of the premises has been recognized as a breach of the duty of care. *See St. Paul Fire & Marine Ins. Co. v. Michigan Consol. Gas Co.*, 4 Mich. App. 56, 63-64, 143 N.W.2d 801, 805 (1966) ("The trial court found the water heater should have been equipped with a temperature and pressure relief value in accord with the practice of the defendant in the community at the time, or defendant should have shut off the gas to the water heater. The defendant did neither and was charged to make a proper repair or forbid the use of the gas."); 52 A.L.R. 864 ("Evidence that building owner installed toilet in washroom of restaurant

therein without any flush tank and supplied with water directly from building supply in violation of city plumbing ordinance was sufficient evidence of such owner negligence, in action for injuries to restaurant proprietor employee burned by scalding water and steam when she attempted to flush toilet bowl.") (citing *Harmon v. M.H. Sherman Co.*, 29 Cal. App. 2d 580, 587, 85 P.2d 205, 208 (1938) ("It is the settled law in California that the failure to perform a duty imposed by law is sufficient evidence of negligence. In the instant case the evidence specifically shows that appellant, the owner of the building where the restaurant was located, in violation of the plumbing ordinance installed a toilet without any flush tank whatsoever, and that the supply of water to the bowl of the said toilet was directly from the building supply.")).

## C. Harm

Ecolab contends that plaintiffs LaPine and Miles have presented "no evidence" that they were injured.  That argument, however, overlooks the plaintiffs' record testimony: LaPine testified that he was seriously burned on his posterior by the scorching hot water.  When he eventually received medical attention, a nurse supplied him with salve, gauze, and tape to treat those injuries. Miles testified that he was seriously burned on his back, and that the burns were severe enough to cause bleeding and skin sloughing.  The plaintiffs' claims of injury are plausible in light of other uncontradicted evidence, including Woodbeck's testimony that he measured water in a steel toilet bowl at a scalding temperature of 150 degrees.  Woodbeck also said that he himself was burned when he attempted to close the water valves on the kitchen sink located immediately below the infirmary, due to the flow of dangerously hot water.  Ecolab insists that the injuries are unsubstantiated because co-defendant Wayne County has produced "no documentation" memorializing any injuries or related medical treatment for LaPine or Miles.  But it has cited no legal authority for the novel proposition that a plaintiff's testimony based on personal knowledge is insufficient standing alone to defeat summary judgment.

* * * * *

Ecolab's attempt to avoid liability for the problematic and illegal plumbing alteration that it allegedly undertook to perform is untenable on the record before the Court and contrary to well settled principles of negligence law recognized by Michigan courts.  The defendant's position that "no evidence" supports the elements of duty, breach, and harm simply ignores the ample record evidence discussed above.  Its motion for summary judgment on the negligence claims will be denied.

### III.  Wayne County's Motion

Local governmental entities cannot be held liable under 42 U.S.C. § 1983 solely for the acts of their agents; they are accountable under that statute only for their own conduct.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (holding that "a municipality cannot be held liable [under section 1983] solely because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory").  The plaintiff, therefore, must point to an official policy, custom, or practice of that local government as the source of the constitutional violation.  *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005).  And he must allege facts that show a causal connection between the policy and the injury.  *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012).  Defendant Wayne County argues that plaintiff Lomax has failed to identify any "custom, policy, or practice" that was the moving force leading to his injury.

A plaintiff can establish *Monell* liability against a county by showing that a "failure to train amounts to deliberate indifference to the rights of persons with whom [its officers] come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  To plead such a claim, the plaintiff must allege facts that demonstrate either (1) "a pattern of similar constitutional violations by

untrained employees and [the defendant's] continued adherence to an approach that it knows or should know has failed to prevent tortious conduct by employees, thus establishing the conscious disregard for the consequences of its action . . . necessary to trigger municipal liability," or (2) "a single violation of federal rights, accompanied by a showing that [the defendant] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738-39 (6th Cir. 2015) (cleaned up).

Lomax maintains that because the record contains evidence that the hot toilet problem affected infirmary cells for six months before the plaintiffs suffered injuries, and LaPine's numerous grievances were ignored by jail officers and allowed to pile up in the infirmary inbox, an inference arises that the practice of ignoring grievances was pervasive enough to show that supervisors constructively were aware of it, and the entrenched custom or practice of ignoring grievances led to the injuries because it resulted in the perpetuation of the dangerous plumbing defect for months.

The Court disagrees.   Plaintiff Lomax has not produced sufficient evidence to demonstrate a pattern or practice resulting from a failure to train or otherwise that led to the plaintiffs' injuries.

As an initial matter, it appears to be undisputed, at least for the purposes of the County's motion, that Lomax suffered severe burns requiring surgery and further treatment as a result of the plumbing hazard created by defendant Ecolab, which allegedly injured not only Lomax but also the two other plaintiffs in these consolidated cases.   The County does not challenge any elements of Lomax's *prima facie* case claiming deliberate indifference to a serious threat to his wellbeing and refusal to provide necessary medical care.   On analogous facts, it has been held that the exposure of an institutionalized adult to a known danger of severe scalding makes out a viable

claim of deliberate indifference under section 1983. *E.g.*, *Brown, by Brown v. Kennedy Krieger Inst., Inc.*, 997 F. Supp. 661, 667-68, 1998 WL 84594 (D. Md. 1998).

Moreover, it is scarcely debatable that denying immediate medical care for an inmate who has suffered severe burns that caused skin sloughing (eventually requiring multiple surgeries and hospital care to treat) constitutes an actionable denial of medical attention under the Eighth Amendment. *See Mitchell v. Rudd Med. Servs.*, No. 21-00055, 2021 WL 1124660, at *2 (M.D. Tenn. Mar. 23, 2021) (citing *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017); *Warren v. Prison Health Servs., Inc.*, 576 F. App'x 545, 552 (6th Cir. 2014)). Lomax alleges that he suffered serious injuries and demanded immediate medical attention, which was denied. He eventually was hospitalized and required multiple surgeries to correct the harm suffered as a result of the scalding incident and refusal to supply treatment.

Nevertheless, when "a plaintiff asserts a custom of inaction towards constitutional violations, [the Sixth Circuit] ha[s] required plaintiffs to show (1) a 'clear and persistent pattern' of misconduct, (2) notice or constructive notice on the part of the municipality, (3) the defendant's tacit approval of the misconduct, and (4) a direct causal link to the violations." *Nouri v. Cnty. of Oakland*, 615 F. App'x 291, 296 (6th Cir. 2015). Lomax's showing fails on the second and third elements on the record so far presented.

As to the first element, the plaintiff has put forth evidence of "a clear and persistent pattern" in which jail officers chronically ignored complaints about the hot toilet hazard. LaPine testified that he did not receive responses to any of his grievances that were submitted in paper form to officers in the infirmary unit. Subsequently, when he was taken past the guard room nearby, he saw stacks of grievance forms that he had submitted which had been dumped into a desktop inbox in the guard room and apparently never forwarded or processed by anyone. Officer Wedlow told

LaPine on September 13, 2019 — the day LaPine was burned and nine days before Lomax was injured — that the infirmary toilets had been supplied with scalding hot water for "six months." Moreover, fellow inmate Brian Jones testified that from July through August 2019, he was housed in cell six of the jail infirmary, and his cellmate Chris Fowler informed him immediately when he was placed there about the hazardous hot toilet problem.  Brian Jones dep., ECF No. 86-12, PageID.2208 ("[H]e said be careful by the toilet because, you know, when you sit down on the toilet, make sure you put something down because it will burn you. It will get real hot.").  Fowler had been in cell 6 for around 90 days and was in the habit of not using the cell toilet, instead waiting until he was taken out for work release to use the bathroom elsewhere.  *Id.* at 2209-10. Jones asked three different jail officers to move him to a different cell because of the hot toilet. *Id.* at 2210-11.  Jones was told that a "maintenance report" would be submitted, but that he could not be moved to a different cell.  *Id.* at 2213-14.  Jones further testified that another cellmate, Reggie Williams, who was in the infirmary from mid-July through mid-August, had made numerous complaints to jail medical staff about the hot toilet situation, pleading with them to move him due to his concern that, as a diabetic, if he was severely burned his wounds would not heal properly.  *Id.* at 2216-18.  Finally, Jones testified that he had seen grievances "get [thrown] in the trash" by jail officers. *Id.* at 2220.  That evidence is sufficient to suggest that the pattern of ignoring complaints about the hot toilets was "clear" and "persistent."  But that is not all that a plaintiff must show to demonstrate the existence of an unwritten "custom" or "policy."

As to the fourth element, it is a reasonable inference from the available facts that the reason the problem was not fixed before Lomax was injured was because jail officers in the infirmary unit routinely ignored inmate complaints and failed or refused to forward grievance forms to other responsible officials who would have fixed the problem.  Woodbeck testified that he never was

aware of the hot water diversion problem or the illegal kitchen sink faucet modification until he received an emergency call after Lomax was injured.  Upon arriving at the jail, Woodbeck immediately diagnosed the problem and removed the offending bypass fixture.  That evidence supports an inference that if the hot water toilet problem had been reported earlier, instead of repeatedly ignored, Lomax's injury would not have occurred.  The alleged refusal to process or forward the complaints therefore has a plausible causal connection with the harm.

However, although Lomax has offered evidence that establishes a section 1983 claim against the individual corrections officers, he has not put forth any evidence that any supervisory county officials had either actual or constructive notice or tacitly approved of the failure to do anything to address the hot toilet situation.  Even viewed in the most generous light, the plaintiff's record demonstrates no more than that repeated complaints about the hot toilets were made by as many as four inmates — LaPine, Jones, Fowler, and Williams — over a period of months preceding the incident in which Lomax was injured.  The record also fairly supports an inference that some jail officers routinely trashed or ignored numerous grievance forms submitted by LaPine and others.  However, the Sixth Circuit has held that as many as five individual incidents of ignored complaints of constitutional injuries are not enough to support an inference of constructive notice or tacit approval sufficient to support *Monell* liability.  *Jones v. Muskegon Cnty.*, 625 F.3d 935, 946 (6th Cir. 2010) ("Although Plaintiff did present evidence that several inmates' medical requests were ignored by jail personnel, including Jones's, a jury could not reasonably infer from these five incidents alone that the County had a widespread, permanent, and well-settled custom of ignoring inmate requests.").

Moreover, only LaPine's prior complaints concerned an actual injury suffered from the hot toilet, so far as the record suggests, and LaPine's injury was the only incident of actual harm that

- 25 -

preceded the harm suffered by Lomax.  The plaintiff essentially "asks the Court to infer that the two isolated incidents of alleged misconduct described in the complaint arose from inadequate training," but "[t]he Supreme Court has long held that an inference of inadequate training based solely upon isolated incidents is 'unwarranted; first, in its assumption that the act at issue arose from inadequate training, and second, in its further assumption concerning the state of mind of the municipal policymakers.'" *Stewart v. Bailey*, No. 22-1018, 2023 WL 236530, at *5 (W.D. Mich. Jan. 18, 2023) (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821 (1985)). "'More importantly,' allowing the inference that [the p]laintiff seeks to make here, would allow 'a § 1983 plaintiff to establish municipal liability without submitting proof of a single action taken by a municipal policymaker.'" *Ibid.*  The record in this case contains no evidence about any affirmative action or decision taken by any County decision maker concerning the hot toilets.

Because plaintiff Lomax has failed to put forth sufficient evidence to sustain his *Monell* claim against the County, its motion for summary judgment will be granted.

IV.

The plaintiffs agree that the record does not support their claims against defendant Ecolab based on a third-party beneficiary theory.  But there is plenty of evidence supporting their negligence claims against that defendant.  Plaintiff Lomax has not established *Monell* liability against defendant Wayne County.

Accordingly, it is **ORDERED** that the motions for summary judgment in each of the consolidated cases by defendant Ecolab, Inc. (LaPine, 21-11308, ECF No. 67; Lomax, 21-11533, ECF No. 75; Miles, 21-13003, ECF No. 45) are **GRANTED IN PART AND DENIED IN PART**. Count IV of the respective complaints are **DISMISSED WITH PREJUDICE**.  The motions are **DENIED** in all other respects.

It is further **ORDERED** that the motion for summary judgment by defendant Wayne County (Lomax, 21-11533, ECF No. 76) is **GRANTED**.  Plaintiff Lomax's claims against defendant Wayne County, **only**, are **DISMISSED WITH PREJUDICE** in case number 21-11533.

It is further **ORDERED** that the case management order is amended as follows:

Pretrial disclosures under Fed. R. Civ. P. 26(a)(3) must be filed by **July 31, 2023**.
Motions *in limine* must be filed by **September 13, 2023**.
Proposed joint final pretrial orders must be submitted by **October 11, 2023**.
The consolidated final pretrial conference shall take place on **October 18, 2023 at 3:00 p.m.**
Trial will begin in the LaPine matter on **October 31, 2023**, to be followed by the Lomax matter and the Miles matter.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  June 20, 2023